IN THE UNITED STATES DISTRICT COURT FOR
                    THE DISTRICT OF MARYLAND, NORTHERN DIVISION

                                        *
SUNNY JANI, as Administrator
of the Estate of MICHAEL L.          *
WEBSTER, deceased,
                                        *
        Plaintiff,
v.                                      *     CIVIL NO.: WDQ-04-1606

BERT BELL/PETE ROZELLE NFL           *
PLAYER RETIREMENT PLAN,
et al.,                                 *

        Defendants.                     *

*      *      *      *      *      *      *      *      *      *      *      *      *

                        MEMORANDUM OPINION AND ORDER

        Sunny Jani, Administrator of the Estate of the late

Michael Webster, has sued the Bert Bell/Pete Rozelle NFL

Player Retirement Plan and the NFL Player Supplemental

Disability Plan (collectively, "the Plan") for wrongful denial

of benefits under the Employee Retirement Income Security Act

of 1974 ("ERISA").[1]  Pending are the parties' cross-motions

for summary judgment.  For the reasons discussed below, the

Plaintiff's motion for summary judgment will be granted, and

the Defendants' motion will be denied.

                                BACKGROUND

        Michael Webster, known as "Iron Mike," was a professional

_____

        [1]29 U.S.C. §§ 1001 *et seq.* (2005).

                                    1

football player for the Pittsburgh Steelers from 1974 until 1988.  Webster Am. Aff. ¶ 2.  Webster, a center on the Steelers' offensive line, played 245 games, the most ever by a center and the fifth most in league history.  Administrative Record at MLW0926.  Webster helped the Steelers achieve four Super Bowl victories in the 1970s and made All-Pro nine times. *Id.* at MLW0925.  At the end of his career, Webster played two seasons for the Kansas City Chiefs, retiring after the 1990 season in March 1991.  *Id.* at MLW0911.  In 1997, Webster was inducted into the Pro Football Hall of Fame in Canton, Ohio, and in 2000 he was elected to the NFL's all-time team.  *Id.* at MLW1291.

The center position is one of the most exposed and unprotected positions on the football field.  Pl.'s Ex. 10 ("Alzado Defends Role in 'Violent Game,'" United Press International, Oct. 29, 1984).  Charged with holding the football to the ground until the snap, he is particularly exposed to blows from offensive linemen.  *Id.*  For example, defensive linemen used a technique called the "head slap," in which they would begin their rush by slapping the center and other offensive linemen on the sides of their helmets to disorient them.  Pl.'s Ex. 8 ("Remembering the Fearsome Foursome," Los Angeles Times, Sept. 16, 1985).  This technique

was outlawed in 1977 because of its risk to offensive linemen, but players continued to use this and other violent strategies. Pl.'s Ex. 10 ("Alzado Defends Role in 'Violent Game,'" United Press International, Oct. 29, 1984).

After retiring from football, Webster auditioned for a television announcer position with NBC. Administrative Record at MLW0911. He was assigned to cover two preseason games as auditions in 1991, but was not hired by the network. *Id.* at MLW1088. Webster earned about $6,000 in wages in 1991, about $10,000 in 1992 for signing sports cards, and about $1,000 in 1993 for card signing and appearance fees. *Id.* at MLW0801-0804, 0807. From 1994 to 1995, Webster was employed as a conditioning coach for the Kansas City Chiefs. *Id.* at MLW0807-0809, 1139. The Chiefs employed Webster "as a favor" because he was not "doing very well during this time period and . . . may have been living in his car." *Id.* at MLW1139. Although Webster attempted to earn income through various investments and odd jobs, he earned virtually nothing from 1996 until his death in 2002. *Id.* at MLW0801-0804.

In 1998, Webster was diagnosed with brain damage resulting from multiple head injuries he sustained during his football career. *Id.* at MLW0040. Because his cognitive functions were so impaired that he could no longer engage in

any type of gainful employment, Webster applied for disability

benefits under the Plan.  *Id.* at MLW0040, 0100-0101.

Webster applied for benefits under Article 5.1(a) of the

Plan, which provides that the "total and permanent disability

benefit will be no less than $4,000 if the disability(ies)

results from League football activities, arises while the

Player is an Active Player, and causes the Player to be

totally and permanently disabled "shortly after" the

disability(ies) first arises."  Pl.'s Ex. 1 (Plan Document at

21).  A player will be deemed totally and permanently disabled

under the Plan if

> the Retirement Board finds that he has become
> totally disabled to the extent that he is
> substantially prevented from or substantially unable
> to engage in any occupation or employment for
> remuneration or profit. . . .  A Player will not be
> considered to be able to engage in any occupation or
> employment for remuneration or profit . . . merely
> because such person is employed by the League or [a
> member club of the League], manages personal or
> family investments, is employed by or associated
> with a charitable organization, or is employed out
> of benevolence.

*Id.* at 22-23.

In support of his claim, Webster submitted the report of

Dr. Fred Krieg, a clinical psychologist, who examined him and

opined that he was totally and permanently disabled as a result

of brain damage received during his career as a professional

football player.  *Id.* at MLW0030-0041.  Dr. Krieg reported that

Webster understood he was being evaluated to determine whether he was disabled. *Id.* at MLW0033. Dr. Krieg observed that "although it is [to] Mr. Webster's advantage to have 'done poorly' on this evaluation, he really tried throughout the interview to make himself look as good as possible, covering up certain information." *Id.* Although Webster told Dr. Krieg that he was self-employed after his retirement from football, Dr. Krieg reported that "he really can't substantiate any kind of gainful employment." *Id.* at MLW0035.

Webster also submitted the report of Dr. Jonathan M. Himmelhoch, a Board-certified professor of Psychiatry at the University of Pittsburgh who serves as the Director of the Research Affective Disorders Clinic at the Western Psychiatric Institute. *Id.* at MLW0632-0656. Dr. Himmelhoch opined that Webster was totally and permanently disabled, with a "traumatic or punch drunk encephalopathy,[2] caused by multiple head blows received while playing center in the NFL." *Id.*

In addition, Webster submitted an affidavit stating that although he was on the Kansas City Chiefs' payroll during 1994 and 1995, he was unable to perform any work for the organization because of symptoms related to his brain injury. *Id.* at

---

[2]Encephalopathy is a disease of the brain, usually involving alterations of brain structure. MERRIAM-WEBSTER MEDICAL DICTIONARY (2003).

MLW0761-0762.  The Chiefs, nonetheless, paid Webster $3,000 per month with the expectation that he would help out if necessary. *Id.* at MLW0762.

As part of the claims review process, the Plan required Webster to undergo a medical examination by a neurologist of its choosing, Dr. Edward Westbrook.  *Id.* at MLW0684-0687.  Dr. Westbrook opined that Webster was totally and permanently disabled as a result of multiple head injuries, and that his disability began in March 1991 or earlier.  *Id.* at MLW0684.  Dr. Westbrook noted that although Webster talked "about being employed [after his retirement from football], it is clear that there is no good description of things that are done specifically."  *Id.* at MW0707.

On November 5, 1999, the Plan informed Webster that he had been approved for total and permanent *degenerative* disability benefits.  *Id.* at MLW0716.  The Plan provides degenerative disability benefits "if the disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of the Player's last Credited Season."  Pl.'s Ex. 1 (Plan Document at 21).

Asserting that he was qualified for active football disability benefits, which would have provided him with greater

disability income, Webster immediately appealed the Plan's decision.  Administrative Record at MLW0721-0723.

On May 8, 2000, the Plan denied Webster's appeal.  *Id.* at MLW0790-0792.  The Plan explained that Webster's medical records and affidavit supported a finding that he had been totally and permanently disabled as a result of League activities, but not that he became totally disabled "shortly after" his disability arose.  *Id.* at MLW0791.  The Plan stated that Dr. Westbrook's report indicated that Webster's disability first arose on or before March 1991, not that he became totally and permanently disabled by that date.  *Id.* at MLW0792.

On July 7, 2000, Webster appealed the Plan's May 2000 decision.  *Id.* at MLW0823-0829.  In support of the appeal, Webster submitted a supplemental report by Dr. Krieg, in which Krieg opined to a reasonable degree of psychological certainty that Webster had become totally and permanently disabled by March 1991 and had been continuously disabled since that time.  *Id.* at MLW0836.  He also submitted a supplemental report by Dr. Himmelhoch.  Dr. Himmelhoch opined to a reasonable degree of medical certainty that Webster's disability arose while he was an active player in the NFL and that he was totally and permanently disabled by March 1991.  *Id.* at MLW0917-0818.

Mr. Webster's attorney also asked the Plan's neutral

physician, Dr. Westbrook, for his opinion of whether Webster was

totally and permanently disabled as of March 1991, or whether

the disability had merely arisen by that time.  Dr. Westbrook

wrote to the Retirement Board and stated:

> It is clear that the patient had significant trouble
> playing football in 1990 and officially retired in
> 1991.  It would appear on that basis that he was
> completely and totally disabled as of the date of his
> retirement and was certainly disabled when he stopped
> playing football sometime in 1990. . . .  He has
> remained completely and totally disabled for any
> occupation beginning in approximately 1990 and will
> not be expected to improve.

*Id.* at MLW0854.

The Plan requested additional evidence such as Social

Security and Internal Revenue records for Webster to aid in its

reevaluation of his disability determination.  Webster supplied

documentation from the Social Security Administration, the

Internal Revenue Service, and the Kansas City Chiefs, which

supported his assertion that the only income he had earned since

his retirement from football was for his employment as an

assistant coach for the Chiefs.  *Id.* at MLW0780-0783,0799-0804,

1262-1268.

On March 17, 2003, because Webster had died while his

appeal was pending, the Plan informed the administrator of his

estate that it had determined that Webster was appropriately

awarded degenerative rather than active football disability

benefits.  *Id.* at MLW1542.  The Plan concluded that Webster had
become totally disabled by September 1, 1996 because:

> Mr. Webster's medical condition began to deteriorate
> seriously around September 1996.  By report dated
> September 5, 1996, Dr. Stanley Marks, an oncologist
> who treated Mr. Webster for possible lymphoma, stated
> that Mr. Webster's life had "really deteriorated
> recently" and that he was living out of a car.  He
> noted for the first time that Mr. Webster had major
> problems with depression and obsessive compulsive
> disorders.  Prior reports by Dr. Marks in 1993 noted
> no such issues, and instead stated that Mr. Webster
> was working and looking well.  Reports by Dr. Jerry
> Carter dated September 5, 1996 and September 11, 1996,
> found that Mr. Webster was suffering from "some type
> of depressive spectrum illness" and "multiple
> orthopedic/joint limitations," and diagnosed him with
> "major depressive disorder with periods of marked
> frustration and agitation."
>
> The Retirement Board found no indication in the
> medical record that, prior to these September 1996
> reports, Mr. Webster exhibited major impairments that
> would render him totally and permanently disabled
> within the meaning of the Plan. . . .  The medical
> record indicates that Mr. Webster had been taking
> antidepressants as early as 1993, but there is no
> indication that his mental condition impaired his
> daily function until the September 1996 reports of Dr.
> Marks and Dr. Carter.

*Id.* at MLW1545.

On April 3, 2002, Webster's estate appealed the Plan's
March 2003 decision.  *Id.* at MLW1549-1550.  The appeal was
denied on July 25, 2003, because the Retirement Board found that
the opinions of Dr. Westbrook, Dr. Krieg, and Dr. Himmelhoch,
who had not examined Webster until 1998 or 1999, were
"speculative and conclusory."  *Id.* at MLW1609-1610.  The

Retirement Board also explained that the Plan restricts benefit awards for any period more than 42 months before the date a player first files a benefits application, "unless a Player can demonstrate that he was physically or mentally incapacitated in a manner that substantially interfered with the filing of a claim." *Id.* at MLW1610.  The Retirement Board noted that the estate's appeal letter did not address this Plan provision.  *Id.* As this letter was the final decision of the Retirement Board, the estate filed suit on May 21, 2004.

STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to summary judgment as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Thus, "the judge must ask . . . whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence

10

presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the opponent must produce evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson*, 477 U.S. at 252.

ANALYSIS

The Retirement Board, as claims fiduciary for the Plan, is vested with "the broadest discretion permissible under ERISA." Pl.'s Ex. 1 (the Plan § 8.6). The court reviews a fiduciary's discretionary decision for abuse of discretion, and will not disturb such a decision if it is reasonable. *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342 (4th Cir. 2000). In determining whether a fiduciary abused its discretion, the court may consider such factors as:

> (1) the language of the plan; (2) the purposes and
> goals of the plan; (3) the adequacy of the materials
> considered to make the decision and the degree to
> which they support it; (4) whether the fiduciary's
> interpretation was consistent with other provisions in
> the plan and with earlier interpretations of the plan;

11

(5) whether the decisionmaking process was reasoned
and principled; (6) whether the decision was
consistent with the procedural and substantive
requirements of ERISA; (7) any external standard
relevant to the exercise of discretion; and (8) the
fiduciary's motives and any conflict of interest it
may have.

*Id.* at 342-43.

The Plaintiff asserts that because the neurologists and
psychologists who examined Webster unanimously opined that he
was totally and permanently disabled under the terms of the Plan
by March 1991, the Retirement Board's classification of his
injuries as football degenerative rather than active football
was not supported by the evidence before it.  The Plan counters
that the physician who treated Webster prior to 1996 did not
diagnose neurological damage, therefore, the Retirement Board
acted within its discretion in determining that he was not
entitled to benefits until September 1996.

Each specialist who examined Webster's neurological status
concluded that he was totally and permanently disabled under the
terms of the Plan by March 1991.  Webster submitted volumes of
evidence which substantiated that he had not been able to
perform work since 1991 including affidavits, Social Security,
and Internal Revenue records.  Even the Plan's Private
Investigator, after interviewing many of Webster's business
associates and acquaintances, stated that although he "attempted
to work at any number of businesses after his career as a player

ended, mostly in the capacity as investor or promoter[,] . . . I was unable to find evidence that any of them succeeded." *Id.* at MLW1124.

It is true that Webster's oncologist did not diagnose cognitive impairments until 1996.  But there is no indication that the oncologist ever examined Webster's neurological function before that time.

It is not an abuse of discretion for a plan fiduciary to deny benefits when it is presented with conflicting medical evidence.  *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir. 1999).  But the conflicting evidence on which the fiduciary relies must be substantial.  *Stup v. Unum Life Ins. Co. of Am.*, 390 F.3d 301, 308 (4th Cir. 2004).

The fact that Webster's oncologist did not diagnose his neurological impairments at an earlier date is insufficient, in light of the overwhelming evidence that he had been disabled since 1991, to justify the Plan's determination that he was not disabled until 1996.

The Plan argues that even if Webster was totally and permanently disabled by March 1991, his estate is not entitled to full benefits under § 5.7 of the Plan, which provides that:

> [N]o total and permanent disability benefit under this
> Article . . . will be payable with respect to any
> month or other period of time that precedes by more
> than forty-two (42) months the date the Plan Director

> first receives a written application or similar letter
> requesting such benefit, provided that such written
> application or similar letter begins the
> administrative process that results in the award of
> the benefit.

As Webster applied for benefits in 1999, the Plan asserts that his estate can, at most, receive benefits retroactive to 1995. The Plan's 42 month limitations period, however, is tolled when a Player is physically or mentally incapacitated in a manner that substantially interferes with the filing of a claim.  Pl.'s Ex. 1

(Plan Document § 5.7).

Given that Webster had been incapacitated by brain damage since 1991, the Plan's limitations period does not apply to his disability claim.

CONCLUSION

For the reasons discussed above, the Plaintiff's motion for summary judgment will be granted and the Defendants' motion will be denied.


<u> April 26, 2005 </u>   <u>   /s/   </u>
Date         William D. Quarles, Jr.
           United States District Judge

14